

# IN THE
# TENTH COURT OF APPEALS

## No. 10-19-00388-CR

**AARON JERRELL BENNETT,**

                                           **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                           **Appellee**

---

**From the 369th District Court**
**Leon County, Texas**
**Trial Court No. 18-0192CR**

---

## MEMORANDUM OPINION

---

The jury convicted Aaron Jerrell Bennett, Appellant, of the offense of burglary of a habitation. TEX. PENAL CODE ANN. §30.02. The jury then assessed Appellant's punishment at confinement for twenty-five years, and the trial court sentenced him accordingly. We affirm.

Appellant presents three issues on appeal. In his first issue, Appellant contends "[t]hat the evidence is legally insufficient." Next, Appellant maintains that "[t]he trial

court (sic) submission of Appellant's purported theory of liability as severable was egregiously harmful." Finally, Appellant urges us to find that "the failure to charge the jury with an accomplice witness instruction was egregiously harmful."

Because Appellant challenges the sufficiency of the evidence to support the verdict, we will review the evidence in some detail.

In the daytime hours of May 24, 2018, burglars broke into Jamie Ferguson's home in Leon County and stole several items from the home. Jamie taught school and was not at home at the time.

The State charged Appellant with the burglary. The State also charged Thomas Nitschmann with the burglary.

Immediately before the time that the burglary occurred, Nitschmann was associated with New Harvest Rehabilitation Ministry. New Harvest Rehabilitation Ministry was a ministry designed to assist drug and alcohol addicts in recovery; Nitschmann was a drug addict and had had several convictions for drug offenses as well as convictions for theft and burglary of a habitation.

In furtherance of the mission of New Harvest, Kenneth Scott with New Harvest rented two rooms at a Dallas motel; Nitschmann stayed in one of the rooms. Nitschmann had a conflict of some kind with the group and had decided to leave New Harvest and go home to Conroe.

Appellant had a room at the same motel and his room was either next or close to Nitschmann's room. At some point, Appellant asked Nitschmann if he wanted to buy some drugs or if he knew anyone who did.

Nitschmann needed a ride to his home in Conroe; he offered Appellant $100 to take him there. At this point, Nitschmann had been taking methamphetamine and Xanex; he did not recall whether he used cocaine with Appellant that night, but he said that it was possible that he did; he was "very high." Appellant was using "coke."

Early the next morning, Appellant, Nitschmann, and a female left for Conroe. At some point, Nitschmann woke up in the backseat. He testified that he remembers seeing a "Centerville" sign. Appellant, according to Nitschmann, told him that he had two choices: jump out of the car or get stabbed. Nitschmann said that he pointed to the first house that he saw and told Appellant that that was where he lived. Nitschmann testified that despite the threat that Appellant had made, Appellant pulled over and he and Nitschmann walked up to the house together. They went to the front of the house first but did not try to gain entry. They then went to the back of the house and, according to Nitschmann, Appellant kicked in the backdoor and they both entered the house. Nitschmann stated that he hid in one of the rooms of the house until Appellant left; he did not know what Appellant did while they were inside the house.

Samuel Pierce, Jamie Ferguson's relative, testified that, on the date of the burglary, he saw a red vehicle parked at Jamie's house. Appellant was standing near the vehicle;

the trunk was open. Appellant apparently saw Pierce and waived at him. When Pierce could not confirm whether anyone should be at Jamie's house, he called law enforcement.

Cody Wood, a deputy with the Leon County Sheriff's Office, responded to the call and met with Pierce at the scene. Pierce told Deputy Wood that a "white man" had been walking back and forth between Pierce's cousin's house and his niece's house. Deputy Wood heard noises from inside a nearby shed. Deputy Wood found Nitschmann inside the shed and Deputy Wood detained him. Nitschmann was "pretty amped up, sweating pretty heavy."

As Deputy Wood talked with Nitschmann, Nitschmann gave inconsistent accounts of what had happened to him. One of those versions was that he had been kidnapped in Bryan and forced into the car at knifepoint. When they arrived at Jamie's house, he was forced at gunpoint to enter the residence. At one point, Nitschmann said that his kidnappers were two black men. At another point, he claimed that his kidnappers were two white men. At yet another point, he maintained that a male and a female kidnapped him. Deputy Wood testified that Nitschmann's statements were all inconsistent and much like statements made by someone under the influence of drugs.

About five days after the burglary, Wayne Sallee, an investigator with the Leon County Sheriff's Office, began an investigation into the burglary. Among other things, Investigator Sallee reviewed the original offense report, photographs made from three game cameras that were located on the property, and he talked with Nitschmann.

The photographs from the game cameras depicted the red vehicle that was at the property; the paper tag on the vehicle was visible in the photograph. From information on the tag, Investigator Sallee was able to determine that Appellant was the owner of the vehicle, and that Mike Carson Motor Company was the lienholder.

Investigator Sallee learned that personnel at Mike Carson Motor Company had installed a tracking device on Appellant's vehicle so that they could know where the vehicle was if they later needed to know that location. When the operator of the vehicle turns the ignition off or on, he triggers the tracking device.

Personnel at Mike Carson Motor Company furnished Investigator Sallee with a report made from information on the tracking device on Appellant's vehicle. Information in that report shows that on the night before the burglary, and into the early morning hours on the day of the burglary, there were multiple activations of the tracking device. The report from the tracking device showed that the vehicle left the Dallas motel around 7:00 a.m. on the morning of the burglary and the device tracked Appellants route from the Dallas motel to the 5900 or 6000 block of FM 1119, the general vicinity of Jamie's home. The report showed a brief stop at a Centerville Jack-In-The-Box just prior to the stop at Jamie's home.

Jamie's mother notified Jamie that there had been a burglary at Jamie's home. When Jamie arrived at her home, she noticed that several items that she normally kept in a front room were in the front yard. She also noticed that a window in the front of her

house "was smashed." When she went to the back of the house, Jamie also saw that "[t]he back door was broke in completely off the hinges, almost" and that a small window beside the door was also broken. When she went into her home after the burglary, she saw that the "front bedroom, it was completely just like a tornado had gone through. Everything was thrown everywhere that was in the closet was all over the room."

One of the items that the burglars took from Jamie's home was a bass guitar in a soft guitar case. Jamie gave the serial number of the bass guitar to law enforcement personnel.

Using the serial number that Jamie had furnished, Investigator Sallee obtained information from a database that showed that, about two and one-half hours after the burglary, Appellant pawned a bass guitar at a pawn shop in Dallas. The serial number of the bass guitar pawned by Appellant matched the serial number on the bass guitar that burglars had taken from Jamie's house. Further, the guitar case matched the one in the photographs from the game camera footage. Investigator Sallee pointed out that in a photograph from game camara footage, Appellant can be seen carrying the bass guitar and case as he walked toward his vehicle.

The game camera footage also contained an image of Appellant's vehicle. Investigator Sallee provided a photograph from that footage to the manager of the Dallas motel where Nitschmann and Appellant had stayed. The manager said that she had seen the vehicle at the motel many times before. Law enforcement asked the manager to notify

them if she saw the vehicle again. Appellant did return to the motel and the manager notified law enforcement. Law enforcement subsequently arrested Appellant.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When we conduct a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight to be afforded to their testimony. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved any conflicts in favor of the verdict,

and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Further, we treat direct and circumstantial evidence equally under this standard. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence to establish a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). Therefore, when we evaluate the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13.

Finally, we measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

It is within the framework of these standards that we review the evidence presented to the jury.

"[A] defendant's unexplained possession of property recently stolen in a burglary permits an inference that the defendant is the one who committed the burglary." *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006) (citing *Willis v. State*, 55 S.W. 829 (Tex. Crim. App. 1900) (unexplained possession of recently stolen property is sufficient to connect a defendant with the taking of the property from the burglarized house, and therefore sufficient to connect the defendant with the burglary).

The evidence shows that a burglary occurred at Jamie Ferguson's home. The evidence also shows that Appellant was on the property on that date. A photograph taken from a game camera shows Appellant as he walked toward his vehicle carrying the bass guitar and case that the evidence shows to have been taken from Jamie's house and that Appellant pawned approximately two and one-half hours after the burglary. No explanation was offered at any time as to some lawful reason for his possessing the bass guitar and case. In addition to the other evidence that we have outlined, Appellant's unexplained possession of property that had been recently stolen in a burglary, and that he pawned close in time and place to where and when the burglary occurred, are sufficient to support the verdict of the jury. Any rational factfinder could have found the essential elements of burglary of a habitation beyond a reasonable doubt. *Jackson*, 443 U.S.

at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). We overrule Appellant's first issue on appeal.

In his second issue on appeal, Appellant argues that the court's charge to the jury "was deficient in two separate manners: (1) the trial court inexplicably charged the jury that it must first consider Appellant's guilt as a principal, and (2) failing to find sufficient evidence as a principal, the jury was then instructed to determine whether Appellant was guilty as a party to the offense."

The trial court instructed the jury that the State's accusation was that Appellant was guilty of the offense of burglary of a habitation under two alternative theories: as a primary actor or as a party. The court then outlined the law as to primary actor liability and party liability.

When the trial court applied the law to the facts, it presented two application paragraphs as far as the burglary was concerned. First, it applied the law to the facts if Appellant acted as a primary actor. At the conclusion of that application paragraph, the trial court instructed the jury, in essence, that if they failed to find, beyond a reasonable doubt, that Appellant was a primary actor in the burglary, then they must find him not guilty and then consider whether he was guilty as a party. There followed a paragraph that applied the law of parties to the facts.

The jury returned this verdict: "We, the jury, find the Defendant, AARON JERRELL BENNETT, guilty of BURGLARY OF A HABITATION, as charged in the indictment."

We must first determine whether error exists. *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996). If there is an error in the charge, we must analyze that error for harm. *Middleton v. State*, 125 S.W.3d 450, 453-54 (Tex. Crim. App. 2003). Appellant did not object to the trial court's charge to the jury.

Unobjected-to jury charge error will not result in reversal of a conviction in the absence of "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). When we examine the record for egregious harm, we consider the entire jury charge, the state of the evidence, the arguments of the parties, and any other relevant information revealed by the record of the trial. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006). The purpose of this review is to illuminate the actual, as opposed to merely theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm asks the question: Did Appellant receive a fair and impartial trial? *Id.* at 171.

Even if we assume, without deciding, that the trial court erroneously charged the jury, we cannot say that Appellant suffered egregious harm.

The evidence that we have outlined in our discussion of Appellant's first issue on appeal was sufficient to prove, beyond a reasonable doubt, that Appellant was guilty as a principal actor. Pictures from game camera videos show that Appellant's vehicle was at the crime scene. Pictures and testimony place Appellant at the crime scene as he stood next to the open trunk of his vehicle. Pictures also show Appellant as he carries a bass guitar and case from the location of Jamie's house toward his vehicle. Appellant pawned that same bass guitar and case some two and one-half hours after the burglary.

Again, "[A] defendant's unexplained possession of property recently stolen in a burglary permits an inference that the defendant is the one who committed the burglary." *Poncio v. State*, 185 S.W.3d at 905. There is no evidence in this record to rebut that presumption. As discussed above, the evidence was sufficient to establish Appellant's guilt as a primary actor. Therefore, even if we were to find error, Appellant has not suffered egregious harm and we overrule his second issue on appeal.

In Appellant's final issue, he asserts that the trial court erred when it did not submit an accomplice witness instruction. Appellant did not object to the failure of the trial court to include an accomplice witness instruction. We review this alleged error under the same standards we employed in our discussion of Appellant's second issue on appeal.

The State argues that Appellant did not establish that Nitschmann was an accomplice witness. For the sake of argument, we will assume, without deciding, that

Nitschmann was an accomplice witness and that the trial court erred when it did not give the jury an accomplice witness instruction. Still, lack of an accomplice witness instruction under the circumstances of this case, did not result in egregious harm.

In *Solis*, Solis was in unexplained possession of a gun that had recently been taken in a burglary. *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990). On appeal, Solis complained about the trial court's failure to give an accomplice witness instruction to the jury. The court held that because Solis was in unexplained possession of recently stolen property, he was not deprived of a fair and impartial trial by the trial court's failure to instruct the jury as to the law on accomplice witness testimony.

Likewise, we conclude that evidence of Appellant's unexplained possession of the recently stolen bass guitar and case was sufficient, standing alone, to convict Appellant; the omission of the accomplice witness instruction did not deprive him of a fair and impartial trial. We overrule Appellant's third issue on appeal.

We affirm the judgment of the trial court.


JIM R. WRIGHT
Senior Chief Justice

Before Chief Justice Gray,
  Justice Johnson, and
  Justice Wright[1]
Affirmed
Opinion delivered and filed September 29, 2021
Do not publish
[CRPM]



---

[1] The Honorable Jim R. Wright, Senior Chief Justice (Retired) of the Eleventh Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.